WAGNER CHOI & VERBRUGGE
Attorneys at Law

CHUCK C. CHOI
NEIL J. VERBRUGGE
ALLISON A. ITO
745 Fort Street, Suite 1900
Honolulu, Hawaii 96813
Telephone: (808) 533-1877
Fax: (808) 566-6900
Email: cchoi@hibklaw.com
nverbrugge@hibklaw.com
aito@hibklaw.com

Proposed Attorneys for Debtor
and Debtor-in-Possession

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re<br><br>CUZCO DEVELOPMENT U.S.A., LLC,<br><br>        Debtor and<br>        Debtor-in-possession. | Case No. 16-00363<br>(Chapter 11)<br><br>Hearing:<br>Date: July 18, 2016<br>Time: 9:30 a.m.<br>Judge: Hon. Robert J. Faris |

MOTION FOR ORDER AUTHORIZING DEBTOR
TO REJECT ALLEGED "MASTER LEASE" WITH JCCHO HAWAII, LLC

      CUZCO DEVELOPMENT U.S.A., LLC, debtor and debtor-in-possession herein (the "Debtor"), hereby moves this Court, pursuant to 11 U.S.C. § 365,

1

Federal Rule of Bankruptcy Procedure 6006 and LBR 6006-1, for entry of an order authorizing the rejection of that certain *alleged* "master lease" with JCCHO HAWAII, LLC ("Jccho"), as further described herein ("Motion"). In support of this Motion, the Debtor respectfully represents as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## PROCEDURAL BACKGROUND

3. The Debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Hawaii (the "Court") on June 20, 2016.

4. The Debtor continues to operate and manage its business, as debtor-in-possession, pursuant to Bankruptcy Code §§ 1107 and 1108.

## BACKGROUND

5. The Debtor's primary asset is a shopping center located on approximately 3.5 acre parcel of commercial real estate located at 805-919 Keeaumoku Street which is commonly known as the Keeaumoku International Village or the Keeamoku Shopping Center (the "Keeaumoku Property").

6. The Keeaumoku Property contains a number of low-rise buildings with commercial tenants, including Sorobol Korean Restaurant and numerous other retail businesses. The supermarket in the Keeaumoku Property is the "anchor" tenant and drives significant traffic to other businesses in the shopping center.

7. The Keeaumoku Property is encumbered by a first mortgage in favor of East West Bank in the approximate amount of $25,070,754.83. The Debtor is also liable for accrued real property taxes totaling approximately $600,000.00. Although the Debtor's Schedules and Statement of Financial Affairs have not been filed as of this date, the Debtor estimates that its undisputed unsecured indebtedness, including tenant deposits, totals less than $500,000. The Property is worth approximately $45 million. Thus this estate is solvent.

## FORMATION OF DEBTOR BY CUZCO KOREA AND THE ACQUISITION OF THE KEEAUMOKU PROPERTY

8. On or about October 3, 2007, Cuzco Korea formed the Debtor for the purpose of acquiring property in Hawaii.

9. At the time Cuzco Korea was initially formed in 2007, the shareholders were as follows: (1) 50% Doo Sup Byun ("Mr. Byun"), and (2) 50% Gunil Kim (Mr. Kim")

10. Under the Debtor's Operating Agreement, Cuzco Korea was the sole member of the Debtor, and Cuzco Korea retained full power to select and remove

the managers of the Debtor. In accordance with that power, in 2007, Cuzco Korea appointed Mr. Byun to act as manager of the Debtor.

11. On or about December 20, 2007, the Debtor closed its purchase of the Keeaumoku Property for approximately $49 million, using funds and resources provided to it by Cuzco Korea and financing from East West Bank ("EWB").

12. In 2010, Mr. Kim transferred his 50% interest in Cuzco Korea to Mr. Sung Hak Choi ("Mr. Choi").

13. In 2011, the Debtor refinanced the loan secured by the Keeaumoku Property with EWB (the "2011 Refinancing") for a five year term, with the loan maturing on April 1, 2016. The EWB loan documents prohibit the Debtor from entering into any "master lease" for the shopping center with a third party without the bank's consent.

14. From as early as 2010, Mr. Byun began to rely on, and place his trust and confidence in his childhood friend Hyung Soo Jang ("Mr. Jang") regarding the management of the Keeaumoku Property. Over time, Mr. Jang assumed more and more administrative duties for the Debtor. He became familiar with the Debtor's business operations, its holdings, and the revenues generated by the Keeaumoku Property.

U.S. Bankruptcy Court - Hawaii   #16-00636   Dkt # 4   Filed 06/20/16   Page 4 of 19

## MR. BYUN'S DEATH AND THE JANG-BYUN RELATIVE GROUP'S ILLEGAL EFFORTS TO SEIZE CONTROL OF CUZCO ENTITIES FROM WIDOW SOO KYUNG YANG

15. In 2013, Mr. Choi transferred 2,942 shares in Cuzco Korea, 14.71% of Cuzco Korea's shares, to Tera Resources Co., Ltd. ("Tera Resources").

16. On or about June 4, 2013, Mr. Byun suddenly died in Korea under suspicious circumstances. Mr. Byun's widow Soo Kyung Yang inherited majority control of Cuzco Korea.

17. After Mr. Byun's June 4, 2013 death, the shareholders of Cuzco Korea were constituted as follows:

   (a) Soo Kyung Yang ("Ms. Yang"): 10,000 shares; 50.00%

   (b) Sung Hak Choi ("Mr. Choi"): 7,058 shares; 35.29%

   (c) Tera Resources Co., Ltd. ("Tera Resources"): 2,942 shares; 14.71%

From time to time, Ms. Yang, Mr. Choi, and Tera Resources are referred to as the "Lawful Shareholders" of Cuzco Korea.

18. For a long period after her husband's death, Ms. Soo Kyung Yang was deeply bereaved, depressed, and in grieving over the loss of her husband. During this period she did not pay close attention to matters relating to Cuzco Korea or the Debtor.

5

19. Sometime in 2014, about one year after Mr. Byun's death on June 4, 2013, unbeknownst to the widow and the Lawful Shareholders of Cuzco Korea, Mr. Jang and others took advantage of Ms. Yang's condition by devising a scheme to illegally sell the Debtor's Keeaumoku Property and disburse the proceeds to themselves. Mr. Jang was joined in his fraudulent scheme by other relatives of the deceased. In particular, Mr. Jong Byun (Mr. Byun's brother), Mr. Jae Byun (Mr. Byun's son (from a prior marriage)) and other Byun relatives (the "Byun Relative Group"), conspired with Mr. Jang and others (collectively the "Jang-Byun Relative Group") to illegally wrest control of the Cuzco entities from the Lawful Shareholders.

20. In order to implement their fraudulent scheme, the Jang-Byun Group needed to usurp control of Cuzco Korea, the parent of the Debtor, and appoint a new manager of the Debtor to sign escrow and sale documents on behalf of the Debtor. The Jang-Byun Relative Group set in motion a two-prong strategy designed to illegally wrest control of the Cuzco entities from the Lawful Shareholders by: (1) filing fraudulent "change of manager" forms purporting to identify Mr. Jang as the "manager" of the Debtor without the consent and knowledge of the Lawful Shareholders, and (2) illegally diluting the Lawful Shareholders voting power by the issuance of 48,000 bogus shares in Cuzco Korea without the consent and knowledge of the Lawful Shareholders.

6

U.S. Bankruptcy Court - Hawaii    #16-00636    Dkt # 4    Filed 06/20/16    Page 6 of 19

21. On or about July 31, 2014, one year after Mr. Byun's death, the Jang-Byun Relative Group secretly and fraudulently caused to be issued 48,000 bogus new shares for Cuzco Korea to D&J GROUP CO. LTD., a Korean corporation ("D&J") a company controlled by the Jang-Byun Relative Group.

22. Shortly thereafter, Mr. Jang terminated the Debtor's professional property management company, TH Realty, Inc. (which controlled the tenant rents) effective as of August 31, 2014, and turned over property management duties to Kris Kim who Mr. Jang hired in June of 2014. Kris Kim, along with her older brother Chang Jin Kim (together the "Kims") occupied office space at the Keeaumoku Property. The Debtor is informed that Chang Jin Kim and Mr. Jang were good friends and that they cooperated to further the fraudulent scheme to illegally control the Debtor.

23. During 2014-2015, it is believed that Mr. Jang, with the assistance of the Kims, illegally siphoned off hundreds of thousands of dollars of rents that belonged to the Debtor for their own personal benefit. During this time, Kris Kim failed to pay the Debtor's property taxes, which went into arrears.

**CUZCO KOREA'S LAWFUL SHAREHOLDERS REMOVE MR. JANG AS MANAGER OF THE DEBTOR AND PREVAIL IN LEGAL ACTION AGAINST MR. JANG IN KOREA**

24. In September 2014, the Lawful Shareholders of Cuzco Korea learned that Mr. Jang had illegally designated himself as manager of the Debtor. The

Lawful Shareholders demanded that Mr. Jang remove himself as manager of the Debtor.

25. On September 27, 2014, Ms. Yang signed a DCCA "change in manager" form that removed Mr. Jang and appointed herself as sole manager of the Debtor. *See* **Exhibit "1"**.

26. On September 30, 2014, the Lawful Shareholders of Cuzco Korea approved a resolution that removed Mr. Jang as manager. *See* **Exhibit "2"**.

27. On or about January 21, 2015, Ms. Yang and Mr. Choi filed a lawsuit in the Seoul Central District Court for the nullification of the illegal 48,000 shares of bogus stock issued to the D&J Group (the "Korean Bogus Share Nullification Lawsuit") in July 2014. *See* **Exhibit "3"**.

28. On March 4, 2015, Ms. Yang filed a derivative action in the Circuit Court of the First Circuit; State of Hawaii; Civil No. 15-1-0378-03 (JHC) (the "Yang State Court Derivative Action") against Mr. Jang (and others) which asserted Mr. Jang was without lawful authority to manage the Debtor, and sought, inter alia, to prevent Mr. Jang (and others) from illegally selling the Debtor's Keeaumoku Property. The State Court Derivative Action against Mr. Jang was a matter of public record.

29. In March 2015, the Lawful Shareholders filed, with the Korea Supreme Prosecutor's Office, a criminal complaint against Seon-uk Kim (the

purported representative director of Cuzco Korea), Mr. Jang, and Jong Byun for their wrongful conduct, including embezzlement, illegal control of Cuzco Korea, the Debtor, and illegal issuance of 48,000 bogus shares in Cuzco Korea, and unlawful meetings and resolutions based on the fraudulent issuance of bogus shares that damaged the Lawful Shareholders. *See* **Exhibit "4"**.

30. Months after Ms. Yang and the Lawful Shareholders had approved a resolution that removed Mr. Jang as manager, and after Ms. Yang had initiated the Yang State Court Derivative Action, and after Ms. Yang and the Lawful Shareholders had filed a criminal complaint against Mr. Jang with the Korea Supreme Prosecutor's Office, Jae Hyon Cho formed Jccho on or about May 18, 2015. *See* **Exhibit "5"**.

31. The Debtor is informed that Jae Hyon Cho and Chang Jin Kim are also good friends and that Jae Hyon Cho has knowingly cooperated in a fraudulent scheme to have Jccho secretly create a bogus "master lease" to illegally control the shopping center in the face of the Korean court ruling.

32. The sole member of Jccho is Jae Hyon Cho. Jae Hyon Cho is married to Sarah Cho. Upon information and belief, Kris Kim and Sarah Cho are close friends, and shared the same office space at 825 Keeaumoku St., #207, Honolulu, Hawaii 96814, before they vacated the space in November, 2015.

33. The alleged "master lease" was purportedly signed by Mr. Jang on June 27, 2015, while the Korean litigation was pending. *See* **Exhibit "6"**. The Debtor denies the validity of Jccho's alleged "master lease" and disputes the circumstances under which the Jccho alleged "master lease" may have been signed.

34. Upon information and belief, Chang Jin Kim, Kris Kim, and Jae Hyon Cho conspired to take advantage of Mr. Jang's limited English reading ability to trick Mr. Jang into signing the alleged Jccho "master lease" without Mr. Jang understanding that the document was a "master lease".

35. The Debtor also questions the authenticity of Mr. Jang's alleged "June 27, 2015" signature on the alleged "master lease", and, upon information and belief, suspects that Jccho may have, after the fact, copied Mr. Jang's signature page from another tenant lease (entered into on or around June 2015), and fraudulently "swapped" this signature page into the alleged Jccho "master lease". Upon information and belief, because Mr. Jang's signature may have been forged by "swapping" a copied signature page from another document (after the fact), Jccho could not register the alleged "master lease" with the Assistant Registrar of the Land Court.

36. In any event, Mr. Jang did not have "actual authority" on behalf of the Debtor to execute the alleged "master lease" as of Mr. Jang's alleged signature

date of "June 27, 2015" because the Lawful Shareholder of Cuzco Korea and the Debtor had already removed Mr. Jang as manager of the Debtor as described herein.

37. On July 24, 2015, the Seoul Central District Court issued a Judgment in the Korea Bogus Share Nullification Lawsuit in favor of Ms. Yang and the Lawful Shareholders to invalidate the illegally issued 48,000 bogus shares. *See* **Exhibit "7"**.

38. The July 24, 2015 Seoul Central District Court Judgment ruled "[i]n light of the above, the arguments put forth by Defendant's assisting parties [Jae Byun and Jong Byun] do not provide sufficient justification for the company's Issuance of New Shares which was undertaken in arbitrary exclusion of the existing shareholder's preemptive rights and resulted in radical changes to the structure of corporate governance."

39. As a result of the July 24, 2015 Seoul Central District Court Judgment, under Korea law, the 48,000 bogus shares issued to D&J Group are invalid. Because the 48,000 bogus shares issued to D&J Group are invalid, none of the subsequent transferees, i.e., the Illegal Shareholders (i.e. DHB Co., Ltd., Soon-Seok Koh, Jae Byun, Seon-kyeong Byun, or Young-beom Kang) had any lawful rights as shareholders of Cuzco Korea.

U.S. Bankruptcy Court - Hawaii #16-00636 Dkt # 4 Filed 06/20/16 Page 11 of 19

40. On July 28, 2015, the Lawful Shareholders of Cuzco Korea appointed Dong Woo Lee to be the Representative Director (President) of Cuzco Korea. *See* **Exhibit "8"**. This resolution acknowledged that any and all actions taken by Mr. Jang to appoint himself manager of the Debtor were unauthorized and illegal.

41. Also, effective July 28, 2015, Cuzco Korea's Representative Director appointed Dong Woo Lee to be manager of the Debtor. *See* **Exhibit "9"**. This written action acknowledged that any and all actions taken by Mr. Jang to appoint himself manager of the Debtor were unauthorized and illegal.

### THE KIMS AND JCCHO CONTINUE ILLEGAL EFFORTS TO CONTROL THE KEEAUMOKU PROPERTY AND RENTS BY MANUFACTURING BOGUS JCCHO "MASTER LEASE"

42. To skirt the definitive Korean judgment, Mr. Jang, the Kims, and Jae Hyon Cho put into action their scheme to use the unauthorized and bogus Jccho "master lease" to maintain control over the Keeaumoku Property and rents therefrom.

43. On July 25, 2015, unbeknownst to Debtor, a mere one day after the July 24, 2015 Seoul Central District Court Judgment, Jccho applied to register the trade name "Keeaumoku Shopping Center" with the DCCA. *See* **Exhibit "10"**.

44. On July 27, 2015, unbeknownst to Debtor, a mere three days after the July 24, 2015 Seoul Central District Court Judgment, Jae Hyon Cho purported to execute the alleged Jccho "master lease". *See* **Exhibit "6"**. The timing of Jccho's

"July 27, 2015" execution of the "master lease", and the diversion of August 2015 rents by Jccho, was not a mere coincidence. The July 24, 2015 Seoul Central District Court Judgment invalidating the 48,000 bogus shares issued to the Illegal Shareholders was a major defeat for the Jang-Byun Relative Group. The Jang-Byun Relative Group was well aware that the "writing was on the wall" against them in the Korean courts. A scheme to prolong their illegal control over the Keeaumoku Property and the Debtor's rents was necessary.

45. Jccho knew or should have known that Mr. Jang did not have actual authority to act on behalf of the Debtor to sign the alleged "master lease". By the end of July, 2015, Sarah Cho, and her husband, Jae Hyon Cho (the sole member of Jccho) knew or should have known that Mr. Jang was the subject of a March 2015 criminal complaint in Korea, had been sued in March 2015 in Yang State Court Derivative Action, and that on July 24, 2015 Seoul Central District Court Judgment was rendered.

46. On July 30, 2015, a mere six days after the July 24, 2015 Seoul Central District Court Judgment, Mr. Jang allegedly signed a letter notifying tenants of the Keeaumoku Property that effective August 1, 2015, Jccho would be "managing" the property, and directing all rent checks be made payable to "Keeaumoku Shopping Center". *See* **Exhibit "11"**. However, Jccho did not

13

provide a copy of the alleged "master lease" to the Lawful Shareholders of Cuzco Korea at this time (or for months thereafter).

47. In a September 2, 2015 letter, even representatives of the Jang-Byun Relative Group admitted that Mr. Jang "acted without prior consultation or approval" in allegedly signing the purported "master lease". *See* **Exhibit "12"**.

48. On or about September 4, 2015, Mr. Jang died under suspicious circumstances in Korea. Nevertheless, the Kims and Jccho refused to stop diverting the Debtor's tenant rents and refused to vacate the Keeaumoku Property and relinquish control of the premises.

49. On October 30, 2015, in the Yang State Court Derivative Action, the parties appearing in that action stipulated to the appointment of George Van Buren as the State Court Receiver to take control of the Debtor's rents, and to prevent further diversion of rents by unauthorized third persons. Jccho attempted to intervene in the State Court Derivative Action; however, after reviewing Jccho's briefing and hearing argument, the Judge Castagnetti denied Jccho's Motion to Intervene.

50. Under pressure from the State Court Receiver, the Kims and Jccho vacated the Keeaumoku Property in November, 2015. Upon vacating the Debtor's property, upon information and belief, Jccho tampered with the Debtor's computer

by deleting a hard drive with the goal of destroying and hiding evidence pertaining to the fraudulent creation of the bogus alleged Jccho "master lease".

51. The State Court Receiver took control of the Debtor's rents for a period of approximately three months. Pursuant to stipulation entered February 4, 2016 in the Yang State Court Derivative Action, the Receiver's duties to collect rent terminated, and the Debtor gained control over the shopping center and resumed collection of rents from tenants through TH Realty.

### JCCHO's CONTINUED INTERFERENCE WITH THE DEBTOR'S OPERATIONS AND TENANTS

52. The dismissal of the receivership simply emboldened Jccho to tortiously interfere with the Debtor's collection of rents from its tenants, even though the Debtor repeatedly advised Jccho that the Debtor denied the validity of the alleged "master lease".

53. On January 21, 2016, East West Bank commenced the "Federal Foreclosure Case" Case No. 1:16-cv-00022 (LEK-BWK) against, among others, the Debtor and Jccho.

54. In the Federal Foreclosure Case, Jccho filed a cross-claim against the Debtor, and , the Debtor filed a cross-claim against Jccho. The competing cross-claims sought a determination of the invalidity or validity of the alleged "master lease". *See* **Exhibits "13-"14"**.

55. On or about May 11, 2016, Jccho sent a letter to the Debtor's tenants improperly directing the Debtor's tenants to pay rent to Jccho. *See* **Exhibit "15"**.

56. On May 12, 2016, the Debtor's property manager was forced to send a follow up letter to tenants to make clear that rent payments should only be made to the Debtor, and not to Jccho. *See* **Exhibit "16"**.

57. On May 16, 2016, Jccho sent letters to the Debtor's tenants asserting that the Debtor's tenants' presence at the Keeaumoku Property was not authorized by Jccho. *See* **Exhibit "17"**.

58. On May 20, 2016, the Debtor's property manager was forced to send follow up letters to Jccho, copied to the Debtor's respective tenants, to make clear that Jccho's May 16, 2016 letter was unauthorized. *See* **Exhibit "18"**.

59. On June 1, 2016, Jccho dba "Keeaumoku Shopping Center" improperly sent an invoice to the Debtor's tenant. *See* **Exhibit "19"**.

## RELIEF REQUESTED AND BASIS

60. This motion is filed out of an abundance of caution. Even if the alleged Jccho "master lease" were valid and enforceable, the Debtor is entitled to reject the lease as a matter of its business judgment.

61. Pursuant to Section 365(a), of the Bankruptcy Code and Bankruptcy Rules 6006 and 9014, the Debtor respectfully requests that the Court enter an order authorizing the Debtor to reject the Lease subject to, and without prejudice to, the

16

U.S. Bankruptcy Court - Hawaii    #16-00636    Dkt # 4    Filed 06/20/16    Page 16 of 19

Debtor's right to argue that the Lease is not valid, and not legally enforceable, and/or the Lease was unrecorded and void pursuant to 11 U.S.C. § 544(a), or other legal arguments.

62. Section 365(a) of the Bankruptcy Code authorizes the assumption or rejection of any executory contract or unexpired lease of the debtor subject to court approval. *See* 11 U.S.C. § 365(a).

63. Although the Bankruptcy Code does not provide guidelines for use in determining whether to approve the debtor in possession's decision to assume or reject an executory contract or unexpired lease, courts have overwhelmingly applied a "business judgment" test. *See, e.g., Durkin v. Benedor Corp., (In re Benedor G.I. Indus., Inc.)*, 204 F.3d 1276, 1282 (9th Cir. 2000) (context of rejection); *Robertson v. Pierce (In re Chi-Feng Huang)*, 23 B.R. 798, 800 (Bankr. 9th Cir. 1982) (rejection); *Richmond Leasing Co. v. Capitol Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) (assumption).

64. In applying the business judgment standard, courts show great deference to a debtor's decision to reject executory contracts. *In re Pomona Valley Medical Group, Inc.*, 476 F.3d 655, 670 (9th Cir. 2007) ("in evaluating the rejection decision, the bankruptcy court should presume that the debtor-in-possession acted prudently, on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the bankruptcy estate"); *In re G.I.*

U.S. Bankruptcy Court - Hawaii #16-00636 Dkt # 4 Filed 06/20/16 Page 17 of 19

*Industries, Inc.*, 204 F.3d 1276 (9th Cir. 2000); *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.)*; 756 F.2d 1043, 1046-47 (4th Cir. 1985); *Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981) (absent extraordinary circumstances, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course").

65. It is critical to the Debtor's reorganization efforts that the Debtor obtains a prompt order rejecting the disputed "master lease". The purported existence of the Jccho lease has severely impeded the Debtor's ability operate the Keeaumoku Property and confused certain tenants even though the Debtor is in possession of the Keeaumoku Property and since November, 2015, all tenants at the shopping center have paid rents over to either the Receiver (care of TH Realty) or directly to the Debtor, through TH Realty.

66. The Debtor must be able to give assurances to its tenants that Jccho may no longer interfere with operations at the shopping center based on the alleged "master lease". Upon rejection, Jccho's "damage" claim can be liquidated in the ordinary course before the Court.

67. The Debtor has also faced difficulty seeking to refinance the matured EWB loan because potential lenders could not obtain a title policy in the face of the Jccho litigation.

18

U.S. Bankruptcy Court - Hawaii #16-00636 Dkt # 4 Filed 06/20/16 Page 18 of 19

68. Thus, rejection of the purported "master lease" is in the best interest of the estate and its creditors.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court grant the Motion, and enter an order: (a) approving the rejection of the Lease, effective as of the Petition Date, subject to, and without prejudice to, the Debtor's right to argue that the Lease is invalid and not legally enforceable, and/or the Lease was unrecorded and void pursuant to 11 U.S.C. § 544(a), or other legal arguments; and (b) granting such other relief as the Court deems fair and just.

DATED: Honolulu, Hawaii, June 20, 2016.

/s/ Neil J. Verbrugge
CHUCK C. CHOI
NEIL J. VERBRUGGE
ALLISON A. ITO
Proposed Attorneys for Debtor and
Debtor-in-Possession