WAGNER CHOI & VERBRUGGE
Attorneys at Law

CHUCK C. CHOI
NEIL J. VERBRUGGE
ALLISON A. ITO
745 Fort Street, Suite 1900
Honolulu, Hawaii 96813
Telephone: (808) 533-1877
Telefacsimile: (808) 566-6900
E-Mail: cchoi@hibklaw.com

Attorneys for Debtor and Debtor-in-Possession

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re<br><br>CUZCO DEVELOPMENT USA, LLC,<br>    Debtor and<br>    Debtor-in-possession | Case No. 16-00636<br>(Chapter 11)<br><br>Disclosure Statement Hearing<br><br>Date: October 24, 2016<br>Time: 2:00 p.m.<br>Judge: Hon. Robert J. Faris |

**DISCLOSURE STATEMENT FOR DEBTOR'S CHAPTER 11 PLAN OF
REORGANIZATION DATED AS OF SEPTEMBER 19, 2016; EXHIBITS
"A"-"B"**

74726.v6f

# TABLE OF CONTENTS

I.       **INTRODUCTION** .................................................................... 1

     A.     Purpose of Disclosure Statement ........................................ 3

     B.     Holders of Claims Entitled to Vote ..................................... 4

     C.     Voting Procedures ............................................................... 5

         1.     **Voting Procedures And Deadlines** ................................. 5
         2.     **Date Of The Confirmation Hearing And Deadlines For Objection To Confirmation Of The Plan** ........................ 6
         3.     **Important Notice and Cautionary Statement** ..................... 6

II.      **BACKGROUND INFORMATION** ..................................... 8

     A.     Debtor's Operations ............................................................ 8

     B.     Events Leading to Filing ..................................................... 9

     C.     East West Bank ................................................................. 15

     D.     2016 Bankruptcy Filing and Creditors ............................. 15

     E.     Post-petition Developments .............................................. 16

         1.     **Use of Cash Collateral** ................................................ 16
         2.     **Debtor's Turnover Motions** ....................................... 17
         3.     **Status of Litigation** ..................................................... 18
         4.     **Post-petition Operations and Current Financial Condition** ........... 19
     F.     Post-Confirmation Payment of U.S. Trustee's Quarterly Fees ....................................................................... 20

     G.     Post-Confirmation Management ....................................... 20

III.     **SUMMARY OF THE PLAN** ........................................... 21

         1.     **Classification and Treatment of Claims and Equity Interests** ........ 21
         2.     **Administrative Expenses (Unclassified Claim)** ................ 21
         3.     **Priority Tax Claims (Unclassified Claim)** ..................... 22
         4.     **Class 1 – Other Priority Claims** ................................. 23
         5.     **Class 2 – Allowed EWB Secured Claim** ...................... 24
         6.     **Class 3 –Allowed City and County of Honolulu Secured Claim** ...... 25

U.S. Bankruptcy Court - Hawaii   #16-00636   Dkt # 197   Filed 09/26/16   Page 2 of 49

| | | | |
|---|---|---|---|
| | 7. | Classes 4 – Convenience Claims | 26 |
| | 8. | Class 5 –General Unsecured Claims | 27 |
| | 9. | Class 6–Subordinated Allowed Claims | 27 |
| | 10. | Class 7 –Equity Interests | 28 |
| B. | | Summary of Other Provisions of the Plan | 28 |
| | 1. | Time and Method of Distributions Under the Plan | 28 |
| | 2. | Provisions for Treatment of Disputed Claims | 29 |
| | 3. | Discharge of the Debtor and Injunction | 30 |
| | 4. | Retention of Rights of Action | 31 |
| | 5. | Exemption from Transfer Taxes | 31 |
| IV. | | VOTING AND CONFIRMATION OF THE PLAN | 32 |
| A. | | General | 32 |
| B. | | Voting Procedures and Requirements | 33 |
| C. | | Confirmation Hearing | 33 |
| D. | | Acceptance or Cramdown | 34 |
| E. | | Best Interests Test; Liquidation Analysis | 34 |
| F. | | Feasibility | 36 |
| G. | | Compliance with Applicable Provisions of the Bankruptcy Code | 37 |
| H. | | Retention of Jurisdiction | 38 |
| V. | | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN | 38 |
| A. | | Consequences to the Debtor | 40 |
| | 1. | Cancellation of Debt | 40 |
| B. | | Consequences to Holders of Certain Claims | 40 |
| C. | | Bankruptcy Code Exemptions from Registration Requirements | 41 |
| VI. | | Recommendation and Conclusion | 41 |

# I. INTRODUCTION

CUZCO DEVELOPMENT USA, LLC, the debtor and debtor-in-possession herein (the "Debtor") has filed a chapter 11 plan of reorganization (the "Plan") to provide for the Debtor to emerge from bankruptcy. A copy of the Plan is attached hereto as Exhibit A. This Disclosure Statement is being sent to you by to help enable you to make an informed judgment about the Plan, and to solicit your acceptance of the Plan. Unless otherwise defined herein, all capitalized terms contained herein shall have the meanings ascribed to them in the Plan.

The Debtor believes that the Plan provides the greatest and earliest possible recovery to holders of Allowed Claims, that acceptance of the Plan is in the best interests of all parties, and that any alternative would result in further delay, uncertainty, expense, and, smaller distributions to holders of Allowed Claims. The Debtor believes the acceptance, confirmation and implementation of the Plan is in the best interests of creditors of the Debtor.

The United States Bankruptcy Court for the District of Hawaii (the "Bankruptcy Court") has scheduled a hearing on _____, 2017, at _____.m. to consider whether to confirm the Plan.

On _____, 2016, after notice and a hearing held on October --, 2016, the United States Bankruptcy Court signed an order approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to

enable hypothetical, reasonable investors typical of the Debtor's creditors to make an informed judgment whether to accept or reject the Plan.

The Disclosure Statement order sets forth deadlines for voting to accept or reject the Plan and procedures to be followed to object to confirmation of the Plan. A ballot for the acceptance or rejection of the Plan is enclosed with the Disclosure Statement that is submitted to the holders of Claims whom are entitled to vote to accept or reject the Plan. In addition, voting instructions accompany each ballot.

Each holder of a Claim entitled to vote on the Plan should read the Disclosure Statement, the Plan, the notice of Confirmation Hearing and the instructions accompanying the ballots in their entirety before voting on the Plan. These documents contain, among other things, important information concerning the classification of Claims and Equity Interests for voting purposes and the tabulation of votes. No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

Attached as Exhibits to this Disclosure Statement are copies of the following:

- The Plan (Exhibit A); and

- The Debtor's Preliminary Financial Projections for January 2017 through December 2017 (the "Projections") (Exhibit B).

## A.    Purpose of Disclosure Statement

The Bankruptcy Code requires that a proponent of a reorganization plan prepare and file with the Bankruptcy Court a "disclosure statement" that provides information of a kind, and in sufficient detail, that would enable a typical holder of claims or equity interests in a class impaired under that plan to make an informed judgment with respect to the plan.  This Disclosure Statement provides such information, as well as information regarding the deadlines for casting ballots with respect to the Plan, the deadlines for objecting to confirmation of the Plan, the requirements that must be satisfied in order for the Bankruptcy Court to confirm the Plan, and other relevant information.  Parties in interest should read this Disclosure Statement, the Plan, and all of the accompanying exhibits in their entirety in order to determine:

- How the Plan will affect their Claims against and Equity Interests in the Debtor;

- Their rights with respect to voting for or against the Plan;

- Their rights with respect to objecting to confirmation of the Plan; and

- How and when to cast a ballot with respect to the Plan.

The Disclosure Statement, however, cannot and does not provide holders of Claims and Equity Interests with legal or other advice.  You should consult with your lawyers and/or financial advisors to obtain specific advice regarding how the

Plan will affect you and regarding your best course of action with respect to the Plan.

**B.      Holders of Claims Entitled to Vote**

Holders of Claims in Classes 2, 3, 4, 5 and 6 (collectively the "Voting Classes") are entitled to vote on the Plan because such Classes are: (i) impaired under the Plan within the meaning of section 1124 of the Bankruptcy Code; and (ii) may receive distributions of property under the Plan and therefore are not deemed to have rejected the Plan under Section 1126(g) of the Bankruptcy Code.

Each holder of an Allowed Claim in Class 1 is deemed to have accepted the Plan because holders of Allowed Claims in this Class are unimpaired. Each holder of an Allowed Equity Interest in Class 7 is deemed to reject the Plan because holders of an Allowed Equity Interests in Class 7 will not receive a distribution under the Plan.

The Bankruptcy Court may confirm the Plan only if at least one Class of impaired Claims has voted to accept the Plan (without counting the votes of any insiders whose Claims are classified within that Class) and if certain statutory requirements are met as to both non-consenting members within a consenting Class and as to dissenting Classes. A Class of Claims has accepted the Plan only when at least one-half in number and at least two-thirds in amount of the Claims actually voting in that Class vote in favor of the Plan.

In the event of a rejection of the Plan by one or more Voting Classes, the Debtor intends to request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code, which permits confirmation notwithstanding such rejection if the Bankruptcy Court finds that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the rejecting Classes.

## C.     Voting Procedures

### 1.     *Voting Procedures And Deadlines*

The Debtor has provided copies of this Disclosure Statement and ballots (which include detailed voting instructions) to all known holders of impaired Claims in the Voting Classes. Those holders of a Claim in a Voting Class who seek to vote to accept or reject the Plan must complete the enclosed ballot and return it to:

> Wagner Choi & Verbrugge
> Chuck C. Choi
> 745 Fort Street, Suite 1900
> Honolulu, Hawaii 96813
> Telephone: (808) 533-1877

so that it actually is received by no later than the Balloting Deadline (as defined below). Creditors are encouraged to read and review their ballots carefully.

**All ballots must be completed, signed, returned to, and actually received by Wagner Choi & Verbrugge by no later than _____, 2017, at 4:00**

**p.m., Hawaii Standard Time (the "Balloting Deadline").** Ballots received after the Balloting Deadline, and ballots returned directly to the Bankruptcy Court, will not be counted in connection with confirmation of the Plan.

> **2.      *Date Of The Confirmation Hearing And Deadlines For Objection To Confirmation Of The Plan***

The hearing to determine whether the Bankruptcy Court will confirm the Plan (the "Confirmation Hearing") will commence on _____, 2017, at _____.m. in the Courtroom of the Honorable Robert J. Faris, United States Bankruptcy Judge for the District of Hawaii. The Confirmation Hearing may be continued from time to time by announcement in open court without further notice.

Any objections to confirmation of the Plan must be filed with the Bankruptcy Court and served no later than _____, 2017.

Objections that are not timely filed and served may not be considered by the Bankruptcy Court. Please refer to the accompanying notice of the Confirmation Hearing for specific requirements regarding the form and nature of objections to confirmation of the Plan.

> **3.      *Important Notice and Cautionary Statement***

The historical financial data relied upon in preparing the Plan and this Disclosure Statement are based upon the Debtor's books and records. The liquidation analysis, estimates, and other financial information referenced in this Disclosure Statement or attached hereto as exhibits have been developed by the

Debtor and its professional advisors. Although these professional advisors assisted in the preparation of this Disclosure Statement, in doing so such professionals relied upon factual information and assumptions regarding financial, business, and accounting data provided by the Debtor and third parties, most of which information has not been audited. The professional advisors of the Debtor have not independently verified such information and, accordingly, make no representations as to its accuracy. Moreover, although reasonable efforts have been made to provide accurate information, the Debtor cannot warrant or represent that the information in this Disclosure Statement, including any and all financial information, is without inaccuracy or omissions, or that actual values or distributions will comport with the estimates set forth herein.

No Person may rely upon the Plan or this Disclosure Statement or any of the accompanying exhibits for any purpose other than to determine whether to vote in favor of or against the Plan. Nothing contained in such documents constitutes an admission of any fact or liability by any party, and no such information will be admissible in any proceeding involving the Debtor or any other Person, nor will this Disclosure Statement be deemed evidence of the tax or other legal effects of the Plan on holders of Claims or Equity Interests in the Bankruptcy Case.

## II. BACKGROUND INFORMATION

### A. Debtor's Operations.

The Debtor is a Hawaii limited liability company formed in 2007. It is owned entirely by a Korean company called Cuzco Korea. Since July, 2015, Dong Woo Lee has served as the Representative Director (President) of Cuzco Korea and the manager of the Debtor. Mr. Lee does not receive a salary from the Debtor.

The Debtor's primary asset is a shopping center located on approximately 3.5 acre parcel located at 805-919 Keeaumoku Street which is commonly known as the Keeaumoku International Village or the Keeaumoku Shopping Center (the "Keeaumoku Property"). There are approximately 49 leasable units in various buildings in the Keeaumoku Property containing a total of approximately 99,328 square feet of gross area, however, the net leasable square footage total approximately 82,629 square feet of leasable area. The Debtor has leased 45 of the 49 units, containing approximately 80,920 square feet of leasable area.

The Keeaumoku Property boasts significant Keeaumoku Street frontage. The Keeaumoku Property contains a number of low-rise buildings with commercial tenants, including Sorabol Korean Restaurant, a supermarket and numerous other restaurants and retail businesses. The supermarket in the Keeaumoku Property is the "anchor" tenant and drives significant traffic to other businesses in the shopping center. The Debtor has historically generated revenue

by renting units at Keeaumoku Property. The Debtor has averaged collections of approximately $200,000 a month in rent, including CAM for 2016.

The Debtor is informed that the highest and best use for the property is its eventual redevelopment because it is in the City & County of Honolulu's Transit Oriented District ("TOD") and is in line for proposed land use entitlement TOD density change. The property could also be sold and re-developed in one or several large parcel groupings, each with primary frontage along Keeaumoku Street.

## B. Events Leading to Filing

On or about October 3, 2007, Cuzco Korea formed the Debtor for the purpose of acquiring property in Hawaii.

At the time, Cuzco Korea's shareholders were as follows: (1) 50% Doo Sup Byun ("Mr. Byun"), and (2) 50% Gunil Kim. In 2007, Cuzco Korea appointed Mr. Byun to act as manager of the Debtor.

On or about December 20, 2007, the Debtor closed its purchase of the Keeaumoku Property for approximately $49 million, using funds and resources provided to it by Cuzco Korea and financing from East West Bank ("EWB").

In 2011, the Debtor refinanced the loan secured by the Keeaumoku Property with EWB (the "2011 Refinancing") in the original principal amount of $25.4 million for a five year term, with the loan maturing on April 1, 2016.

From as early as 2010, Mr. Byun began to rely on, and place his trust and confidence in his childhood friend Hyung Soo Jang ("Mr. Jang") regarding the management of the Keeaumoku Property. Over time, Mr. Jang assumed more and more administrative duties for the Debtor, and became familiar with the Debtor's business operations, its holdings, and finances.

## MR. BYUN'S DEATH AND THE JANG-BYUN RELATIVE GROUP'S ILLEGAL EFFORTS TO SEIZE CONTROL OF CUZCO ENTITIES FROM WIDOW SOO KYUNG YANG

On or about June 4, 2013, Mr. Byun suddenly died in Korea under suspicious circumstances. Mr. Byun's widow, Soo Kyung Yang, inherited majority control of Cuzco Korea.

After Mr. Byun's death, the shareholders of Cuzco Korea were constituted as follows:

      (a)     Soo Kyung Yang ("Ms. Yang"): 10,000 shares; 50.00%

      (b)     Sung Hak Choi ("Mr. Choi"): 7,058 shares; 35.29%

      (c)     Tera Resources Co., Ltd. ("Tera Resources"): 2,942 shares; 14.71%

From time to time, Ms. Yang, Mr. Choi, and Tera Resources are referred to as the "Lawful Shareholders" of Cuzco Korea.

For a long period after her husband's death, Ms. Yang was deeply bereaved, depressed, and in grieving. During this period, she did not pay close attention to matters relating to Cuzco Korea or the Debtor.

Sometime in 2014, unbeknownst to the Lawful Shareholders, Mr. Jang and others took advantage of Ms. Yang's condition by devising a scheme to sell the Debtor's Keeaumoku Property and disburse the proceeds to themselves. Mr. Jang was joined in his scheme by other relatives of the deceased. In particular, Mr. Jong Byun (Mr. Byun's brother), Mr. Jae Byun (Mr. Byun's son (from a prior marriage)) and other Byun relatives (the "Byun Relative Group"), conspired with Mr. Jang and others (collectively the "Jang-Byun Relative Group").

To take control of the Cuzco entities from the Lawful Shareholders, the Jang-Byun Relative Group: (1) filed fraudulent "change of manager" forms purporting to identify Mr. Jang as the "manager" of the Debtor without the consent and knowledge of the Lawful Shareholders, and (2) illegally diluted the Lawful Shareholders voting power by the issuance of 48,000 bogus shares in Cuzco Korea to D&J GROUP CO. LTD., a Korean corporation ("D&J") a company controlled by the Jang-Byun Relative Group without the consent and knowledge of the Lawful Shareholders.

Shortly thereafter, Mr. Jang terminated the Debtor's professional property management company, TH Realty, Inc. (which controlled the tenant rents)

effective as of August 31, 2014, and turned over property management duties to Kris Kim. Kris Kim, along with her older brother Chang Jin Kim (together the "Kims") occupied office space at the Keeaumoku Property. The Debtor is informed that Chang Jin Kim and Mr. Jang were good friends.

During 2014-2015, the Debtor believes that Mr. Jang, with the assistance of the Kims, diverted hundreds of thousands of dollars of rents that belonged to the Debtor for their own personal benefit, instead of paying the real property taxes for the Keeaumoku Property.

## CUZCO KOREA'S LAWFUL SHAREHOLDERS REMOVE MR. JANG AS MANAGER OF THE DEBTOR AND PREVAIL IN LEGAL ACTION AGAINST MR. JANG IN KOREA

In September 2014, the Lawful Shareholders of Cuzco Korea learned that Mr. Jang had illegally designated himself as manager of the Debtor. The Lawful Shareholders demanded that Mr. Jang remove himself as manager of the Debtor.

On September 27, 2014, Ms. Yang signed a DCCA "change in manager" form that removed Mr. Jang and appointed herself as sole manager of the Debtor.

On September 30, 2014, the Lawful Shareholders of Cuzco Korea approved a resolution that removed Mr. Jang as manager.

In the first few months of 2015, several lawsuits were commenced to return control and management to the Lawful Shareholders:

- On or about January 21, 2015, Ms. Yang and Mr. Choi filed a lawsuit in the Seoul Central District Court for the nullification of the illegal

48,000 shares of bogus stock issued to the D&J Group (the "Korean Bogus Share Nullification Lawsuit") in July 2014.

- On March 4, 2015, Ms. Yang filed a derivative action in the Circuit Court of the First Circuit; State of Hawaii; Civil No. 15-1-0378-03 (JHC) (the "Yang State Court Derivative Action") against Mr. Jang (and others) which asserted Mr. Jang was without lawful authority to manage the Debtor, and sought, inter alia, to prevent Mr. Jang (and others) from illegally selling the Debtor's Keeaumoku Property.

- In March 2015, the Lawful Shareholders filed, with the Korea Supreme Prosecutor's Office, a criminal complaint against Seon-uk Kim (the purported representative director of Cuzco Korea), Mr. Jang, and Jong Byun for their wrongful conduct, including embezzlement, illegal control of Cuzco Korea, the Debtor, and illegal issuance of 48,000 bogus shares in Cuzco Korea, and unlawful meetings and resolutions.

On July 24, 2015, the Seoul Central District Court issued a Judgment in the Korea Bogus Share Nullification Lawsuit in favor of Ms. Yang and the Lawful Shareholders to invalidate the illegally issued 48,000 bogus shares.

On July 28, 2015, the Lawful Shareholders of Cuzco Korea appointed Dong Woo Lee to be the Representative Director (President) of Cuzco Korea.

Also, effective July 28, 2015, Cuzco Korea's Representative Director appointed Dong Woo Lee to be manager of the Debtor.

### THE KIMS AND JCCHO CONTINUE ILLEGAL EFFORTS TO CONTROL THE KEEAUMOKU PROPERTY AND RENTS BY MANUFACTURING BOGUS JCCHO "MASTER LEASE"

To skirt the definitive Korean judgment, Mr. Jang, the Kims, and Jae Hyon Cho (a good friend of Chang Jin Kim, whose wives were also good friends) used

the fabricated "master lease" to maintain control over the Keeaumoku Property and rents therefrom.

Shortly after Jae Hyon Cho formed JCCHO Hawaii LLC("JCCHO"). In May 2015, Mr. Jang (on behalf of the Debtor), and Jae Hyon Cho (on behalf of JCCHO) purportedly signed the alleged JCCHO "master lease".

On or about September 4, 2015, Mr. Jang died under suspicious circumstances in Korea. Nevertheless, the Kims and JCCHO continued to, amongst other things, divert the Debtor's tenant rents and refuse to relinquish control of the Keeaumoku Property.

On October 30, 2015, in the Yang State Court Derivative Action, George Van Buren was appointed as the State Court Receiver to take control of the Debtor's rents, and to prevent further diversion of rents by unauthorized third persons. JCCHO unsuccessfully attempted to intervene in the State Court Derivative Action.

Under pressure from the State Court Receiver, the Kims and JCCHO vacated the Keeaumoku Property in November, 2015.

Pursuant to stipulation entered February 4, 2016 in the Yang State Court Derivative Action, the Receiver's duties to collect rent terminated, and the Debtor gained control over the shopping center and resumed collection of rents from tenants through TH Realty.

## C.    East West Bank

On January 21, 2016, EWB commenced the "Federal Foreclosure Case" Case No. 1:16-cv-00022 (LEK-BWK) against, among others, the Debtor and Jccho.  In the Federal Foreclosure Case, JCCHO and the Debtor filed a cross-claim against each other.  The competing cross-claims sought a determination of the invalidity or validity of the alleged "master lease".

On January 27, 2016, EWB filed a Motion to Appoint Receiver ("EWB Receiver Motion"). A further hearing on the EWB Receiver Motion was scheduled for June 30, 2016, but the Debtor's chapter 11 filing stayed the Federal Foreclosure Case.

## D.    2016 Bankruptcy Filing and Creditors

On June 20, 2016 (the "Petition Date"), the Debtor commenced this case by filing a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court.

As of the Petition Date, the balance of the EWB loan was approximately $25,400,000.00.  The EWB loan matured by its terms on April 1, 2016, and EWB is claiming default interest on the loan.

On July 12, 2016, the Debtor filed its *Schedules and Statement of Financial Affairs*, which sets forth the Debtor's creditors and financial condition as of the Petition Date.  The Debtor scheduled approximately $2.9 million in general

unsecured creditors, virtually no priority (tax) debts, the EWB secured loan, and a City and County secured claim for delinquent real property taxes.

In its Schedules, the Debtor valued its Keeaumoku Property at approximately $45 million.

## E.    Post-petition Developments

### 1.    *Use of Cash Collateral*

On June 23, 2016, the Debtor filed its *Motion for Order Authorizing Debtor to Use Cash Collateral* (the "Cash Collateral Motion") seeking authority to continue to use the proceeds of the Keeaumoku Property that permitted the Debtor to use cash collateral to pay normal, operating expenses and certain Chapter 11 expenses, including fees payable to the U.S. Trustee, the allowed fees and expenses of the Debtor's professionals.

On June 27, 2016, EWB filed its *Objection to Motion for Order Authorizing Debtor to Use Cash Collateral Pursuant to Stipulation* ("Cash Collateral Opposition"), and argued, among other things, that EWB it lacked adequate protection.

At an interim cash collateral hearing held on June 27, 2016, the Court authorized the interim use of cash collateral provided, however, that the Debtor could not use cash collateral to pay its professionals, and should pay post-petition real property taxes.  The Court also held hearings on use of cash collateral on July

18, 2016, August 15, 2016, and September 26, 2016, and has allowed the Debtor to use cash collateral to pay the expenses of the Keeaumoku Property, but not the Debtor's lawyers.

The Debtor has paid all post-petition real property payments, and as of September 16, 2016 has made $17,666.67 adequate protection payments for post-petition interest accrual on pre-petition real property tax delinquencies.

On August 22, 2016, Ms. Nakano and Mr. Lee produced documents pursuant to the 2004 examination request by EWB.

On August 30, 2016, EWB took the 2004 oral examination of Ms. Nakano. On August 31, 2016, EWB took the 2004 oral examination of Mr. Lee.

### 2. Debtor's Turnover Motions

On July 1, 2016, the Court approved a *Stipulated Order Authorizing Receiver to Turn Over Cash Collateral to Secured Creditor and Approving Receiver's Reasonable Fees and Expenses Pursuant to 11 U.S.C. §543* (the "Receiver Turnover Order"). Under the Receiver Turnover Order, the State Court Receiver George Van Buren was required to turn-over $400,000.00 in his possession to EWB and retain $6,337.45 for reasonable fees and costs for the Receiver and his counsel under 11 U.S.C. § 543(c)(2).

On August 22, 2016, the Debtor filed its *Motion for Turnover of Asus Computer* ("Computer Turnover Motion"), seeking immediate turnover of Asus

Computer in the State Court Receiver's possession. On August 22, 2016, the Debtor filed its *Motion for Turnover of Rent* ("Rent Turnover Motion"), seeking immediate turnover of rent in the possession of attorney Leighton Lee who asked for Court instructions (whether to pay the Debtor or JCCHO) on behalf of four tenants at the Keeaumoku Property.

JCCHO filed oppositions to both the Computer and Rent Turnover Motions. Over the objections of JCCHO, the Bankruptcy Court approved both the Rent Turnover Motion and the Computer Turnover Motion at a hearing held on September 19, 2016.

### 3. *Status of Litigation*

On August 4, 2016, the Bankruptcy Court entered orders authorizing the Debtor to reject (a) the purported "master" sublease between Cuzco USA and JCCHO; (b) the commercial lease between Cuzco USA and Yedang Entertainment USA, Inc. ("Yedang") for Space I-102A (Retail Shops) (the "Retail Lease"); and (c) the commercial lease between Cuzco USA and Yedang for unit I-102 (Supermarket) (the "Supermarket Lease"). The Debtor takes the position that the Retail Lease and Supermarket Lease was validly terminated pre-petition.

On July 15, 2016, the Debtor filed a complaint against JCCHO seeking to void the purported "master" sublease, commencing Adversary Proceeding entitled *CUZCO DEVELOPMENT U.S.A., LLC v. JCCHO HAWAII, LLC*, Adv. Pro. No.

16-90031.  The Debtor has filed  a motion for summary judgment to obtain a determination to void the purported sandwich lease.

On July 19, 2016, the Debtor filed a complaint against Yedang seeking to void the Supermarket Lease and the Retail Lease, commencing Adversary Proceeding entitled *CUZCO DEVELOPMENT U.S.A., LLC v. YEDANG ENTERTAINMENT USA, INC.*, Adv. Pro. No. 16-90032.  The Debtor has filed  a motion for summary judgment to obtain a determination to void the Supermarket and Retail Leases.

Trial dates have not been set for either adversary proceeding, but the Debtor anticipates that trial will commence sometime in fall 2017.

The Debtor also has  filed motions to estimate the claims of JCCHO and Yedang.  The hearing for the estimation motions is currently scheduled for October 24, 2016.

### 4.    *Post-petition Operations and Current Financial Condition*

As of the Petition Date, the Debtor had approximately 46 operating tenants. During August, 2016, monthly rental income totaled approximately $_____, and monthly CAM charges totaled approximately $_____, excluding the approximately $133,000 of rents/CAM being held by attorney Leighton Lee.

The Debtor collects approximately $64,717 in CAM per month from its tenants, and the monthly base rent (currently $181,466.60 per month) which is expected to increase to approximately $206,705.89 per month starting in October, 2016, when tenant leases are re-negotiated.

## F.  Post-Confirmation Payment of U.S. Trustee's Quarterly Fees

The Debtor shall pay any and all accrued post-petition U.S. Trustee's quarterly fees, including any such fees that accrue after the confirmation of the Plan. The Debtor shall pay post-confirmation quarterly fees until the Chapter 11 case is closed by the Bankruptcy Court, dismissed or converted to another chapter under the Bankruptcy Code.

The Debtor will file post-confirmation status reports required by the U.S. Trustee Guidelines in the proper form.

## G.  Post-Confirmation Management

From and after the Effective Date, NewCo Shareholder shall be the sole equity owner in NewCo. Property management services will be provided by Kay Nakano at TH Realty, Inc. TH Realty, Inc.'s compensation is 5% of gross receipts per month for property management services. Dong Woo Lee will be the manager of NewCo Shareholder.

## III.    SUMMARY OF THE PLAN

The Discussion of the Plan set forth below is qualified in its entirety by reference to the Plan, the terms of which are controlling.  Holders of Claims and Interests and other interested parties are urged to read the Plan in its entirety so that they may make an informed judgment concerning the Plan.

### 1.    *Classification and Treatment of Claims and Equity Interests*

The Plan provides for the treatment of 7 Classes of Claims and 1 Class of Equity Interests.  The treatment of Claims described below applies only to Allowed Claims and Equity Interests.  Claims that are the subject of a pending objection before the Bankruptcy Court or other pending litigation, or that have not been allowed pursuant to a Final Order of the Bankruptcy Court, will receive distributions under the Plan only if and after they become Allowed Claims.  The Reorganized Debtor retains the right to initiate proceedings to subordinate or otherwise object to Claims prior to the proposed deadline of 180 days from the Effective Date.

### 2.    *Administrative Expenses (Unclassified Claim)*

The Plan provides that the Reorganized Debtor shall pay to each holder of an Allowed Administrative Expense, Cash in an amount equal to such Allowed Administrative Expense on the later of the Effective Date and the date such Administrative Expense becomes an Allowed Administrative Expense, or on such

different terms as may be acceptable to the holder of the Allowed Administrative Expenses.  In the case of goods and services provided to the Debtor in the ordinary course of its business during the Chapter 11 Case from the Petition Date through and including the Effective Date in the ordinary course of business, such ordinary course of business Administrative Expenses shall be paid upon the date upon which such liability is payable in the ordinary course of the Debtor's business, consistent with the current agreement of the parties.

The Confirmation Order shall contain a bar date for purposes of assertion and allowance of Administrative Expense Claims, other than Administrative Expenses which are Ordinary Course Administrative Expenses.  The Confirmation Order shall also contain a deadline for the Reorganized Debtor to object to Administrative Expense Claims, including Ordinary Course Administrative Expenses.

The Debtor estimates that there will be about $300,000.00 in accrued and unpaid administrative claims as of the Effective Date, consisting primarily of professionals.

### 3.    *Priority Tax Claims (Unclassified Claim)*

The Allowed Priority Tax Claim held by any taxing authority relating to any taxable year shall be the lesser of: (a) the Allowed Claim held by such entity; (b) the estimated claim amount held by such entity, if estimated by the Bankruptcy

Court for purposes of allowance; or (c) the amount of such claim as determined by any administrative or judicial tribunal of competent jurisdiction before which such issue is brought by final order or as compromised and settled by the Reorganized Debtor and such taxing authority.

Each holder of an Allowed Priority Tax Claim shall receive on account of such Claim regular installment payments in Cash (i) of a total value, as of the Effective Date, equal to the Allowed amount of such Claim, (ii) over a period not later than five years from the Petition Date; and (iii) at a 3.00% interest rate per annum or such other rate as may be ordered by the Bankruptcy Court.

The Debtor believes that the State of Hawaii, Department of Taxation holds a valid priority tax claim in the approximate amount of $13,000 for GET.

### 4. *Class 1 – Other Priority Claims*

The Plan classifies all Other Priority Claims in Class 1. Except to the extent that the holder of an Allowed Other Priority Claim agrees to a different treatment, the holder of an Allowed Other Priority Claim shall receive on account of such Allowed Claim, Cash in the amount equal to the holder's Allowed Claim, on the later of (a) the Effective Date; and (b) the date on which an order allowing such Claim becomes a Final Order, and, in each case, or as soon thereafter as is practicable.

Class 1 is unimpaired and the holders of Claims in Class 1 are deemed to accept the Plan and are not entitled to vote to accept or reject the Plan. The Debtor is not aware of any Other Priority Claims.

### 5.    *Class 2 – Allowed EWB Secured Claim*

The Plan classifies the EWB Secured Claim in Class 2. The EWB Secured Claim is evidenced by a Promissory Note in the principal amount of $25,400,000.00 dated March 15, 2011, signed by the Debtor and payable to East West Bank ("EWB"). The Note bears variable interest rate at 3.00% plus Index rate per annum and matured by its terms on April 1, 2016. EWB has asserted that the principal balance of the Note as of June 1, 2016, was $25,070,754.83 (excluding interest, and fees). Inclusive of interest and fees, the Debtor estimates EWB was owed approximately $26 million as of the Petition Date.

Unless EWB and the Debtor agree to a different treatment, EWB shall receive payment in full as follows:

- The principal balance of the Allowed EWB Secured Claim shall be an amount equal to the amount outstanding under the EWB note as of the Effective Date.

- EWB shall be paid $3 million within five (5) Business Days after the Effective Date (the "EWB Paydown").

- From and after the Effective Date, the Debtor shall continue to make monthly debt service payments to EWB by entering into a loan extension with EWB on the following terms:

    o Loan Amount: $23,000,000.00 (the anticipated loan balance equal to Allowed EWB Secured Claim less

$3 million payment).

- o Loan Fee: $460,000 (2.0% of the Loan Amount)

- o Interest Rate: 5.0% fixed for the 1 year term of the loan

- o Monthly Payment: Monthly interest only payment beginning on the one month anniversary of the EWB Paydown

- o Term: One (1) year, with balloon payment due on the Refinance Deadline

- o Amortization: None

- o Maturity: Refinance Deadline (i.e., one year anniversary of the Effective Date)

- o Guarantor: Dong Woo Lee

- o Collateral: All collateral securing the EWB Secured Claim, including but not limited to EWB's first priority mortgage lien over the Keeaumoku Property.

- o Costs: Debtor responsible for all third party costs, including but not limited to appraisals, documentation, title insurance, recording and escrow fees.

Class 2 is impaired and EWB is entitled to vote to accept or reject the Plan.

**6.    *Class 3 –Allowed City and County of Honolulu Secured Claim***

The Plan classifies the Allowed City and County of Honolulu Secured Claim in Class 3.

Unless the City and County and the Debtor agree to a different treatment, the City and County shall receive, on the Refinance Deadline or as soon thereafter as is practicable, in full satisfaction of its Allowed Claim, Cash equal to the value of its Allowed Claim.

Class 3 is impaired, and the holder of Claims in Class 3 is entitled to vote to accept or reject the Plan.

### 7. *Classes 4 – Convenience Claims*

The Plan classifies Convenience Claims in Class 4. Convenience Claims are General Unsecured Claims which are: (i) in the amount of $5,000 or less or (ii) in the amount greater than $5,000 but which the holder agrees to reduce to $5,000 in order to be treated as a Convenience Claim. The Debtor estimates that there are approximately $14,400.00 in valid Convenience Claims that fall under the $5,000 threshold.

Holders of Allowed Convenience Claims shall receive Cash in an amount equal to 100 percent (100%) of the Allowed amount of such Convenience Claim, 30 days after the Effective Date or as soon thereafter as is practicable.

Class 4 is impaired, and the holders of Allowed Claims in Class 4 are entitled to vote to accept or reject the Plan.

## 8. *Class 5 – General Unsecured Claims*

The Plan classifies all holders of Allowed General Unsecured Claims in Class 5. The Debtor estimates that there is approximately $456,000.00 in valid General Unsecured Claims (not contingent, liquidated, undisputed), $400,000.00 of which constitute amounts owed to Dong Woo Lee (which claim will be treated in Class 6). Additionally, Debtor has scheduled approximately $298,700[1] in tenant security deposits, which will not be reimbursed until the tenant vacates which will be paid or adjusted in the ordinary course of business.

The holder of an Allowed General Unsecured Claims shall receive on account of its Allowed General Unsecured Claim in full and complete satisfaction, discharge and release thereof: One hundred percent (100%) of their Allowed Claims with post-petition interest at 3.00% simple interest per annum paid in full within 30 days after the Refinance Deadline.

Class 5 is impaired, and the holders of Allowed Claims in Class 5 are entitled to vote to accept or reject the Plan.

## 9. *Class 6 – Subordinated Allowed Claims*

The Plan classifies all holders of Subordinated Allowed General Unsecured Creditors in Class 6. The general unsecured claims of Dong Woo Lee totaling $400,000 shall be deemed Subordinated Allowed Claims.

---

[1] There are five (5) tenants that entered into leases when Kris Kim was "managing" the Keeaumoku Property. However, the Debtor has no records of these leases or whether these tenants paid a security deposit.

Holders of Subordinated Allowed Claims shall be paid one hundred percent (100%) of their Allowed Subordinated Claims with post-petition interest at 3.00% simple interest per annum after Holders of Allowed Class 5 Claims are paid in full.

Class 6 is impaired and the holders of Subordinated Allowed Claims in Class 6 are entitled to vote to accept or reject the Plan.

### 10.    *Class 7 –Equity Interests*

The Plan classifies the Equity Interests of the Debtor in Class 7. The holder of the Allowed Equity Interests in the Debtor shall not receive any distribution on account of its Allowed Equity Interests. Any Allowed Equity Interests in the Debtor which was issued and outstanding or authorized as of the Petition Date, shall be deemed canceled and extinguished as of the Effective Date.

Class 7 is impaired, and the holders of the Allowed Equity Interests in the Debtor are deemed to reject the Plan as this Class will not receive a distribution under the Plan.

## B.    Summary of Other Provisions of the Plan

### 1.    *Time and Method of Distributions Under the Plan*

NewCo shall serve as the disbursing agent to hold and distribute Cash and such other property as may be distributed pursuant to the Plan, provided however, that NewCo, in its sole and absolute discretion, may employ another Person, on such terms as may be determined by NewCo, to hold and distribute Cash and such

other property as may be distributed pursuant to the Plan. Even if the disbursing

agent is a person other than NewCo, nonetheless the disbursing agent shall be an

agent of NewCo and not a separate taxable entity with respect to, for example, the

assets held, income received or disbursements or distributions made for NewCo.

No Cash payment of less than ten dollars ($10.00) shall be made by the Disbursing

Agent to any holder of a Claim.

### 2.    *Provisions for Treatment of Disputed Claims*

Notwithstanding all references in the Plan to Claims that are Allowed, in

undertaking the calculations concerning Allowed Claims or Allowed

Administrative Expense Claims under the Plan, including the determination of the

amount or number of distributions due to the holders of Allowed Claims and

Allowed Administrative Expense Claims, each Disputed Claim shall be treated as

if it were an Allowed Claim or Allowed Administrative Expense Claim for

purposes of voting on the Plan, except that if the Bankruptcy Court estimates the

likely portion of a Disputed Claim to be Allowed or authorized or otherwise

determines the amount or number which would constitute a sufficient reserve for a

Disputed Claim (which estimates and determinations may be requested by the

Reorganized Debtor), such amount or number as determined by the Bankruptcy

Court shall be used as to such Claim. Objections to Claims must be filed and

served within 180 days of the Effective Date.

### 3. *Discharge of the Debtor and Injunction*

Except as provided in the Plan or Confirmation Order, the rights afforded hereunder and the treatment of Claims, Administrative Expense Claims and Equity Interests under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims and Administrative Expense Claims and termination of all Equity Interests, including any interest accrued on Claims from the Petition Date. Except as provided in the Plan or the Confirmation Order, confirmation will: (i) discharge the Debtor and Reorganized Debtor from all Claims, Administrative Expense Claims or other debts that arose before the Confirmation Date and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a proof of Claim based on such debt is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (b) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (c) the holder of a Claim or Administrative Expense Claim based on such debt has accepted the Plan; and (ii) terminate all Equity Interests and other rights of Equity Interest holders in the Debtor. As of the Confirmation Date, except as provided in the Plan or the Confirmation Order, all Entities shall be precluded from asserting against the Debtor, the Reorganized Debtor, their successors or their property, any other or further claims, debts, rights, causes of action, liabilities or

equity interests based upon any act, omission, transaction or other activity of any nature that occurred prior to the Confirmation Date.

### 4. *Retention of Rights of Action*

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtor, to the extent set forth below, and its successors, any assigns hereunder and future assigns will retain and may exclusively enforce any rights of action subject only to any express waiver or release thereof in the Plan or in any other contract, instrument, release, indenture or other agreement entered into in connection with the Plan, and the Confirmation Order's approval of the Plan shall be deemed a *res judicata* determination of such rights to retain and exclusively enforce such rights of action unless the Bankruptcy Court orders otherwise. Absent such express waiver or release, the Reorganized Debtor, or its successors or assigns may pursue rights of action, as appropriate, in accordance with the best interests of the Reorganized Debtor (or its successors or future assigns).

### 5. *Exemption from Transfer Taxes*

Pursuant to section 1146(c) of the Bankruptcy Code, any transfers from the Debtor to the Reorganized Debtor or any other Person pursuant to the Plan including (a) the issuance of any stock, (b) the creation of any mortgage deed or trust, or other security interest, and (c) the making of any agreement or instrument in furtherance of, or in connection with, this Plan, shall not be subject to any

document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment.

## IV. VOTING AND CONFIRMATION OF THE PLAN

### A. General

The following discussion is intended solely for the purpose of providing basic information concerning certain confirmation issues. The Debtor cannot and does not represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Bankruptcy Court may confirm the Plan. Some of the requirements discussed in this Disclosure Statement include acceptance of the Plan by the requisite number of holders of Claims and Interests, and whether the Plan pays such holders at least as much as they would receive in a liquidation of the Debtor under chapter 7 of the Bankruptcy Code. These requirements, however, are not the only requirements for confirmation, and the Bankruptcy Code will not confirm the Plan unless and until it determines that the Plan satisfies all applicable requirements, including requirements not referenced in this Disclosure Statement.

## B. Voting Procedures and Requirements

Pursuant to the Bankruptcy Code, only classes of Claims against or Equity Interests in the Debtor that are "impaired" under the terms of the Plan are entitled to vote to accept or reject the Plan. A class is "impaired" if the legal, equitable or contractual rights attaching to the claims or interests of that class are modified, other than by curing defaults and reinstating maturity. Classes of Claims that are not impaired are not entitled to vote on the Plan and are conclusively presumed to have accepted the Plan. In addition, classes of Claims or Equity Interests that receive no distributions under the Plan are not entitled to vote on the Plan and are deemed to have rejected the Plan unless such Class otherwise indicates acceptance.

## C. Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on whether the Debtor has fulfilled the Confirmation requirements of section 1129 of the Bankruptcy Code. The Confirmation Hearing has been scheduled for _____, at _____.m. before the Honorable Robert J. Faris, United States Bankruptcy Court for the District of Hawaii, 1132 Bishop Street, Suite 250L, Honolulu, Hawaii 96813. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing. Any objection to Confirmation must be made

in writing and must specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or Equity Interest held by the objector. Any such objections must be Filed and served upon the Persons designated in the notice of the Confirmation Hearing, in the manner and by the deadline described therein.

**D.      Acceptance or Cramdown**

As a condition to confirmation, the Bankruptcy Code requires that each Class of Impaired Claims vote to accept the Plan, except under certain circumstances.

**E.      Best Interests Test; Liquidation Analysis**

Another confirmation requirement is the so-called "Best Interests Test" created by section 1129(a)(7) of the Bankruptcy Code. The Best Interests Test requires that, if a holder of a Claim or Equity Interest is in an impaired Class and does not vote to accept the Plan, such holder receives or retains an amount under the Plan not less than the amount that such holder would receive or retain if the Debtor was to be liquidated under chapter 7 of the Bankruptcy Code.

The Debtor acknowledges that it is solvent and submits that creditors would receive payment in full in a liquidation of the estate.

In a chapter 7 case, a trustee would be appointed to liquidate the Debtor's assets for distribution to creditors in accordance with the priorities set forth in the Bankruptcy Code. Under those priorities, secured creditors generally are paid first from the sales proceeds of properties securing their liens. Administrative expenses generally are paid next. Unsecured creditors then are paid from any remaining sales proceeds, according to their statutory and contractual rights to priority. Unsecured creditors with the same priority share in proportion to the amount of their allowed claim in relationship to the amount of total allowed unsecured claims. Finally, shareholders or partners receive the balance, if any, that remains after all creditors are paid.

A chapter 7 trustee would likely pursue payments made by the Debtor prior to the Petition Date that are avoidable under the Bankruptcy Code, such as claims to recover preferential and fraudulent transfers. The Debtor did not make payments to insiders during the one year period prior to the Petition Date. The Debtor did make payments to creditors during the 90 day period prior to the Petition Date which may be pursued by a chapter 7 trustee as preferential transfers. However, the Debtor does not intend to pursue insider preferences given that the Plan provides for full payment to creditors.

In a chapter 7 case, a chapter 7 trustee with no familiarity with the bankruptcy case would be appointed to complete the liquidation and distribution

U.S. Bankruptcy Court - Hawaii   #16-00638 Dkt # 197   Filed 09/26/16   Page 38 of 49

process.  The Debtor believes that a chapter 7 trustee would incur additional fees before holders of pre-petition general unsecured claims receive a distribution.

For the Bankruptcy Court to be able to confirm the Plan, it must find that holders of Claims and Interests who do not accept the Plan will receive at least as much under the Plan as such holders would receive under a hypothetical chapter 7 liquidation of the Debtor.  The Debtor submits that this requirement is met here because, among other things, the Plan pays unsecured creditors in full with interest.

## F.    Feasibility

To confirm the Plan, the Bankruptcy Court must find that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor.  This requirement is imposed by section 1129(a)(11) of the Bankruptcy Code and is referred to as the "feasibility" requirement.

The Debtor believes that its cash flow will be more than adequate to support: (a) a Refinance of the Keeaumoku Property; and (b) payments under the Plan even if the Refinance is not consummated.

The Debtor cautions however that no representations can be made as to the accuracy of the projections or as to the Reorganized Debtor's ability to achieve the projected results.  Many of the assumptions upon which the projections are based are subject to uncertainties outside the control of the Debtor.  Some assumptions inevitably will not materialize, and events and circumstances occurring after the

date on which the projections were prepared may be different from those assumed or may be unanticipated, and may adversely affect the Reorganized Debtor's financial results. Therefore, the actual results may vary from the projected results and the variations may be material and adverse.

It is important to understand when reviewing the monthly operating reports that a month-to-month review can result in skewed view of the Debtor's financials. For example, it is not unusual for the percentage rent income to fluctuate from month to month, based on tourist season. While month to month review provides a good look at cash flow, the Debtor believes it is more helpful to analyze its business by viewing quarterly or semi-annual basis.

THE PROJECTIONS WERE NOT PREPARED IN COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS, THE PRACTICES RECOGNIZED TO BE IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES. FURTHERMORE, THE PROJECTIONS HAVE NOT BEEN AUDITED BY INDEPENDENT ACCOUNTANTS.

G.     **Compliance with Applicable Provisions of the Bankruptcy Code**

Section 1129(a)(1) of the Bankruptcy Code requires that the Plan comply with the applicable provisions of the Bankruptcy Code. The Debtor has considered

each of these issues in the development of the Plan and believes that the Plan complies with all provisions of the Bankruptcy Code.

## H.     Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Reorganization Case and any of the proceedings related to the Reorganization Case pursuant to section 1142 of the Bankruptcy Code and 28 U.S.C. § 1334 to the fullest extent permitted by the Bankruptcy Code and other applicable law, including, without limitation, such jurisdiction as is necessary to ensure that the purpose and intent of the Plan are carried out.

## V.     CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN

The following discussion summarizes certain federal income tax consequences of the implementation of the Plan to the Debtor and certain holders of Claims. The following summary does not address the federal income tax consequences to (i) holders whose Claims are entitled to reinstatement or payment in full in Cash, or are otherwise unimpaired under the Plan (*e.g.*, holders of Administrative Expense Claims, holders of Priority Tax Claims), or (ii) holders whose Claims or Equity Interests are or may be extinguished without a distribution in exchange therefor.

The following summary is based on the Internal Revenue Code of 1986, as amended (the "Code"), Treasury Regulations promulgated thereunder, judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service ("IRS") as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtor has not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt. In addition, this summary does not address foreign, state or local tax consequences of the Plan.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## A. Consequences to the Debtor

The Debtor is a limited partnership and thus is a pass-through entity for tax purposes.

### 1. *Cancellation of Debt*

In general, the Code provides that a debtor in a bankruptcy case must reduce certain of its tax attributes – such as loss carryforwards and current year losses, tax credits, and tax basis in assets – by the amount of any cancellations of debt ("COD"). COD is the amount by which the indebtedness discharged exceeds any consideration given in exchange therefor.

## B. Consequences to Holders of Certain Claims

Each holder of a Claim will recognize gain or loss measured by the difference between (i) any cash and the fair market value of any other property received by such holder and (ii) its adjusted tax basis in the Claim. This income, gain or loss will be capital gain or loss if the Claim is a capital asset in the holder's hands. Holders of Claims in the form of accounts or notes receivable acquired in the ordinary course of a trade or business for the performance of services or for the sale of inventory will recognize ordinary income, gain or loss. In addition, if a holder of a Claim has taken an ordinary deduction for the worthlessness of the Claim under the Code in a prior taxable year, any income or gain realized will be taxed as ordinary income to the extent of the ordinary deduction claimed.

## C.      Bankruptcy Code Exemptions from Registration Requirements

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a-77aa and applicable state securities laws if three principal requirements are satisfied:  (i) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, an affiliate participating in a joint plan with the debtor or a successor to the debtor under the plan; (ii) the recipients of the securities must hold a prepetition or administrative expense claim against or an interest in the debtor; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor or such an affiliate, or principally in such exchange and partly for cash or property.

## VI.      Recommendation and Conclusion

For all of the reasons set forth in this Disclosure Statement, the Debtor believes that the confirmation of the Plan is preferable to all other alternatives. Consequently, the Debtor urges all holders of Claims in voting Classes to vote to accept the Plan and to evidence their acceptance by duly completing and returning their ballots so that they will be received on or before the voting deadline.

DATED: Honolulu, Hawaii, September 26, 2016

CUZCO DEVELOPMENT USA, LLC

/s/ Dong Woo Lee
Dong Woo Lee, Manager

Submitted by:

/s/ Chuck C. Choi
CHUCK C. CHOI
Attorneys for Debtor and Debtor-in-Possession
Cuzco Development USA, LLC

# EXHIBIT A

# [to be inserted]

Property: Keeaumoku International Village
Total SF: 82629 Leaseable Area

2017 Operating Plan
Income & Rental Expenses Projections

As of: 9/23/16

| | 2017 JAN | 2017 FEB | 2017 MAR | 2017 APR | 2017 MAY | 2017 JUN | 2017 JULY | 2017 AUG | 2017 SEP | 2017 OCT | 2017 NOV | 2017 DEC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NEWCO CONTRIBUTION | 5,000,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| OPENING CASH IN BANK ACCOUNT | 12,000.00 | 1,351,670.44 | 1,178,777.86 | 1,222,389.67 | 1,266,226.79 | 1,314,938.90 | 1,358,651.02 | 1,402,498.13 | 1,248,995.25 | 1,287,707.36 | 1,316,444.48 | 1,361,985.08 |

| | 2017 JAN | 2017 FEB | 2017 MAR | 2017 APR | 2017 MAY | 2017 JUN | 2017 JULY | 2017 AUG | 2017 SEP | 2017 OCT | 2017 NOV | 2017 DEC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *RENTAL INCOME: (Assumes 93.24% occupancy)* | | | | | | | | | | | | |
| Base Rent Income | 194,705.89 | 194,705.89 | 194,705.89 | 194,705.89 | 194,705.89 | 194,705.89 | 194,705.89 | 194,705.89 | 194,705.89 | 194,705.89 | 194,705.89 | 194,705.89 |
| Prepaid Rents | | | | | | | | | | | | |
| CAM Recovered | 64,717.10 | 64,717.10 | 64,717.10 | 64,717.10 | 64,717.10 | 64,717.10 | 64,717.10 | 64,717.10 | 64,717.10 | 64,717.10 | 64,717.10 | 64,717.10 |
| General Excise Tax Recovery | 9,448.73 | 9,448.73 | 9,448.73 | 9,448.73 | 9,448.73 | 9,448.73 | 9,448.73 | 9,448.73 | 9,448.73 | 9,448.73 | 9,565.46 | 9,565.46 |
| Tenant Parking Income | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| Other Income | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **TOTAL INCOME** | 268,871.72 | 268,871.72 | 268,871.72 | 268,871.72 | 268,871.72 | 268,871.72 | 268,871.72 | 268,871.72 | 268,871.72 | 268,871.72 | 271,540.64 | 271,540.64 |
| **TOTAL CASH BEFORE DISBURSEMENTS** | 5,280,871.72 | 1,620,542.16 | 1,447,649.28 | 1,491,261.39 | 1,535,098.51 | 1,583,810.62 | 1,627,522.74 | 1,671,359.85 | 1,517,866.97 | 1,556,579.08 | 1,587,985.12 | 1,633,406.32 |

**EXHIBIT B**

| RENTAL EXPENSES: | 2017 JAN | 2017 FEB | 2017 MAR | 2017 APR | 2017 MAY | 2017 JUN | 2017 JULY | 2017 AUG | 2017 SEP | 2017 OCT | 2017 NOV | 2017 DEC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **RENTAL EXPENSES** | | | | | | | | | | | | |
| **I. RECOVERABLE EXPENSES:** | | | | | | | | | | | | |
| **CLEANING EXPENSES:** | | | | | | | | | | | | |
| Contract Cleaning Service | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 |
| Other Cleaning & Janitorial | 350.00 | 350.00 | 350.00 | 350.00 | 350.00 | 350.00 | 350.00 | 350.00 | 350.00 | 350.00 | 350.00 | 350.00 |
| Grease Trap | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 |
| Trash Removal | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 |
| **TOTAL CLEANING EXPENSES** | 14,450.00 | 14,450.00 | 14,450.00 | 14,450.00 | 14,450.00 | 14,450.00 | 14,450.00 | 14,450.00 | 14,450.00 | 14,450.00 | 14,450.00 | 14,450.00 |
| **REPAIRS/MAINTENANCE:** | | | | | | | | | | | | |
| Plumbing | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 |
| Electrical | | | 5,000.00 | | | 5,000.00 | | | | 5,000.00 | | 5,000.00 |
| Lock/Key Repairs | | | 100.00 | | | | | | | 100.00 | | |
| Other Repairs/Maintenance | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 |
| **TOTAL REPAIRS/MAINTENANCE** | 5,000.00 | 5,000.00 | 10,100.00 | 5,000.00 | 5,000.00 | 10,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 10,100.00 | 5,000.00 | 5,000.00 |
| **UTILITIES:** | | | | | | | | | | | | |
| Electric | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 |
| Water /Sewer | 21,000.00 | 21,000.00 | 21,000.00 | 21,000.00 | 21,000.00 | 21,000.00 | 21,000.00 | 21,000.00 | 21,000.00 | 21,000.00 | 21,000.00 | 21,000.00 |
| **TOTAL UTILITIES** | 29,000.00 | 29,000.00 | 29,000.00 | 29,000.00 | 29,000.00 | 29,000.00 | 29,000.00 | 29,000.00 | 29,000.00 | 29,000.00 | 29,000.00 | 29,000.00 |
| **SECURITY** | | | | | | | | | | | | |
| Security Contract Service | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 |
| **TOTAL SECURITY EXPENSE** | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 |
| **ADMINISTRATIVE:** | | | | | | | | | | | | |
| Management Fees | 14,077.05 | 14,077.05 | 14,077.05 | 14,077.05 | 14,077.05 | 14,077.05 | 14,077.05 | 14,077.05 | 14,077.05 | 14,077.05 | 14,216.78 | 14,216.78 |
| General Office Expense | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 |
| On-site Manager | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 |
| Misc. | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 |
| **TOTAL ADMINISTRATIVE** | 18,177.05 | 18,177.05 | 18,177.05 | 18,177.05 | 18,177.05 | 18,177.05 | 18,177.05 | 18,177.05 | 18,177.05 | 18,177.05 | 18,316.78 | 18,316.78 |
| **FIXED EXPENSES:** | | | | | | | | | | | | |
| Real Property Taxes | | 202,205.00 | | | | | | 202,205.00 | | | | |
| Real Property Taxes Appeal | | | | | | | | | | | | |
| Insurance: Liability | 4,300.00 | 4,300.00 | 4,300.00 | 4,300.00 | 4,300.00 | 4,300.00 | 4,300.00 | 4,300.00 | 4,300.00 | 4,300.00 | 0.00 | 18,000.00 |
| Professional Fees: Non-legal | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 |
| **TOTAL FIXED EXPENSES** | 5,300.00 | 207,505.00 | 5,300.00 | 5,300.00 | 5,300.00 | 5,300.00 | 5,300.00 | 207,505.00 | 5,300.00 | 5,300.00 | 1,000.00 | 19,000.00 |
| **TOTAL RECOVERABLE EXPENSES** | 76,927.05 | 279,132.05 | 82,027.05 | 76,927.05 | 76,927.05 | 81,927.05 | 76,927.05 | 279,132.05 | 76,927.05 | 82,027.05 | 72,766.78 | 90,766.78 |

Expected CAM: $1,297,451.70 ÷ 82,629 SF Leaseable Area = $1.30 per SF

| RENTAL EXPENSES: | 2017 JAN | 2017 FEB | 2017 MAR | 2017 APR | 2017 MAY | 2017 JUN | 2017 JULY | 2017 AUG | 2017 SEP | 2017 OCT | 2017 NOV | 2017 DEC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **I. NON-RECOVERABLE EXPENSES:** | | | | | | | | | | | | |
| *VARIOUS ACCOUNTS* | | | | | | | | | | | | |
| Non-recoverable building (Cap E | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 |
| Non-recoverable electric | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Debt Service - Plan Payment | 3,460,000.00 | 95,833.33 | 95,833.33 | 95,833.33 | 95,833.33 | 95,833.33 | 95,833.33 | 95,833.33 | 95,833.33 | 95,833.33 | 95,833.33 | 95,833.33 |
| Professional Fees; Legal | 350,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 |
| Other administrative Expense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Bad Debt Expense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Advertising/promotion | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Advertising/promotion (Leasing) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| General Excise Tax: Linked | 12,099.23 | 12,099.23 | 12,099.23 | 12,099.23 | 12,099.23 | 12,099.23 | 12,099.23 | 12,099.23 | 12,099.23 | 12,099.23 | 12,219.33 | 12,219.33 |
| Depreciation | | | | | | | | | | | | |
| Real Property Interest Payment | 5,300.00 | 5,300.00 | 5,300.00 | 5,300.00 | 5,300.00 | 5,300.00 | 5,300.00 | 5,300.00 | 5,300.00 | 5,300.00 | 5,300.00 | 5,300.00 |
| UST FEES | 4,875.00 | 0.00 | 0.00 | 4,875.00 | 0.00 | 0.00 | 4,875.00 | 0.00 | 0.00 | 4,875.00 | 0.00 | 0.00 |
| PLAN PAYMENTS (Excl. EWB) | 19,400.00 | 19,400.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **TOTAL NON-RECOVERABLE EXPENSES** | 3,852,274.23 | 162,632.56 | 143,232.56 | 148,107.56 | 143,232.56 | 143,232.56 | 148,107.56 | 143,232.56 | 153,232.56 | 158,107.56 | 153,352.66 | 153,352.66 |
| *TOTAL RENTAL EXPENSES* | 3,929,201.28 | 441,764.61 | 225,259.61 | 225,034.61 | 230,159.61 | 225,159.61 | 225,034.61 | 422,364.61 | 230,159.61 | 240,134.61 | 226,119.44 | 244,119.44 |
| **NET OPERATING INCOME:** | 2017 JAN | 2017 FEB | 2017 MAR | 2017 APR | 2017 MAY | 2017 JUN | 2017 JULY | 2017 AUG | 2017 SEP | 2017 OCT | 2017 NOV | 2017 DEC |
| I. NOI WITH RECOVERABLE EXPENSES: | 191,944.67 | (10,260.33) | 186,844.67 | 191,944.67 | 191,944.67 | 186,944.67 | 191,944.67 | (10,260.33) | 191,944.67 | 186,844.67 | 198,773.86 | 180,773.86 |
| II. NOI WITH NON-RECOVERABLE EXPENSES: | (3,660,329.56) | (172,892.89) | 43,612.11 | 43,837.11 | 48,712.11 | 43,712.11 | 43,837.11 | (153,492.89) | 38,712.11 | 28,737.11 | 45,421.20 | 27,421.20 |
| CASH BALANCE | 1,351,670.44 | 1,178,777.56 | 1,222,389.67 | 1,266,226.79 | 1,314,938.90 | 1,358,651.02 | 1,402,488.13 | 1,248,995.25 | 1,287,707.36 | 1,316,444.48 | 1,361,865.68 | 1,389,286.68 |